**E-FILED**
Wednesday, 07 October, 2009  03:31:11 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| In re CHADDRICK RAYMOND CARVER, | ) |
| | ) |
| Debtor, | ) |
| | ) |
| JEFFREY D. RICHARDSON, Chapter 7 Trustee, | ) No. 09-3167 |
| | ) |
| Appellant, | ) |
| | ) Appeal from the |
| v. | ) U.S. Bankruptcy Court |
| | ) Central District of Illinois |
| CHADDRICK RAYMOND CARVER, | ) Hon. Mary Gorman, presiding |
| | ) Bankruptcy No. 07-72602 |
| | ) Adversary No. 08-7035 |
| Appellee. | ) |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Appellant, Chapter 7 Bankruptcy Trustee Jeffrey D. Richardson, filed an adversary proceeding to deny a discharge to Debtor Chaddrick Raymond Carver.  Richardson alleged that Carver fraudulently transferred money to hinder and delay creditors, and made intentionally false statements under oath in the bankruptcy process.  <u>Bankruptcy Code</u> §§ 727(a)(2)(A) & (a)(4)(A), 11 U.S.C. §§ 727(a)(2)(A) & (a)(4)(A).  The Bankruptcy Court

entered an order in favor of Carver.  Richardson now appeals.  For the reasons set forth below, this Court affirms in part, reverses in part, and remands for further proceedings.  This Court affirms the Bankruptcy Court's decision with respect to the Trustee's § 727(a)(2)(A) claim, but reverses with respect to the § 727(a)(4)(A) claim.  The Bankruptcy Court clearly erred in finding that Richardson failed to prove that Carver intentionally made false statements regarding his income during the year before filing bankruptcy.  The Court remands this case for the Bankruptcy Court to determine whether these false statements were material.

<u>STATEMENT OF FACTS</u>

Carver became a licensed real estate broker in the year 2000.  In 2006, he was the sole owner of a limited liability company named Carver Properties, LLC.  Carver Properties owned 22 rental properties in the Decatur, Illinois, area.  Carver financed the purchase of these properties with loans secured by mortgages on the properties.  Many of these loans had adjustable interest rates.  According to Carver, the interests rates on many of these loans increased in 2006, and as a result, he was unable to service the loans.  <u>Record on Appeal (d/e 1) (Record)</u>, at 145.

In late 2006, Carver sought alternate financing.  Carver was

2

introduced to a man named Nick Muscato of Orlando, Florida.  Muscato arranged a short term loan of $200,000.00 to Carver from the Muscato Family Limited Partnership #2 (Muscato Loan).  The loan was due in 60 days, with interest that accrued at 25 percent per annum.  In addition, Carver paid an origination fee of $20,000.00.  In the spring of 2007, Carver defaulted on the Muscato Loan.  By then, Carver also had defaulted on several mortgage loans.

Carver was married to Tammy Carver (Tammy).  In 2007, Tammy and Carver had two children under the age of 10 and owned a home on Autumn Ridge Court in Decatur, Illinois (Autumn Ridge Home).  Tammy was a kindergarten teacher and was not involved in Carver's business affairs.  She was not obligated on any of his business loans, including the Muscato Loan.  Carver had also kept his business financial problems from her.

By May 2007, Carver decided to tell Tammy about his financial problems.  On May 29, 2007, Carver and Tammy went to see an attorney, Andrew Bourey.  They paid Bourey a retainer of $1,000.00.  At that time, Tammy learned of the extent of Carver's financial problems.  Tammy was horrified when she learned of Carver's financial problems.  Record, at 129.  At that time, Tammy and Carver discussed Carver's options with Bourey.

The discussion included the option of bankruptcy.  Record, at 103.  After the meeting with Bourey, Tammy and Carver decided to put the Autumn Ridge Home up for sale.

Carver listed the Autumn Ridge Home with Markwell Weatherford Realty (MW).  Carver was an agent with MW, and was the listing agent for the Autumn Ridge Home.  In July 2007, Tammy and Carver sold the Autumn Ridge Home for $505,000.00.  The sale closed on July 26, 2007.  The settlement sheet showed that Tammy and Carver received $206,969.10 in net proceeds from the sale (Sale Proceeds).  Separate Appendix of Appellant (d/e 3) (Appendix), at 141.  In addition, the settlement sheet showed that real estate commissions of $30,300.00 were paid.  According to the settlement sheet, half of the commissions, or $15,150.00, was paid to MW.  Appendix, at 142.  As the listing agent for MW, Carver was entitled to approximately half of this amount, or approximately $7,500.00, as his commission on the sale (Commission).  Record, at 107-08, 152.  Carver, however, received a commission check for approximately $6,000.00 to $7,000.00 because MW deducted some overdue dues.  Record, at 107.

Carver endorsed the check for the Sale Proceeds and gave it to Tammy.  Tammy deposited half of the Sale Proceeds into her personal

checking account (Tammy Account).  She then deposited the rest of the Sale Proceeds into a new account (New Account).  Carver also endorsed his commission check to Tammy.  She deposited the Commission into the New Account.  The New Account had approximately $110,000.00 in it, representing half of the Sale Proceeds, plus the Commission.  Tammy was listed as the sole owner of both accounts.  Carver was not listed on either account.

After the closing, in August 2007, Tammy paid $4,600.00 to Bourey from the New Account.  This sum represented a $2,000.00 retainer for filing bankruptcy for Carver and $2,000.00 for filing bankruptcy for Carver Properties.  Tammy paid the remaining $600.00 to cover $300.00 in filing fees for each bankruptcy.  Tammy and Carver made additional payments to Bourey from August to December.  Record, at 154; Appendix, at 110.  All tolled, Carver paid Bourey approximately $8,000.00 from May 2007 until he filed bankruptcy in December 2007.  Record, at 127.

In July 2007, Carver's main concern was Muscato.  Muscato had threatened Carver's family, and Carver wanted to make sure that he was paid.  See Record, 146-49.  Muscato had hired an attorney in Decatur to collect the Muscato Loan.  Bourey represented Carver in negotiations with

Muscato's counsel.  He also represented Carver in foreclosure actions filed by secured lenders.  In September 2007, Carver negotiated a settlement of the Muscato Loan.  Under the settlement, Carver paid the Muscato Family Limited Partnership #2 $85,000.00, and Carver Properties conveyed to Muscato a rental property located at 1313 W. Main, Decatur, Illinois.  In return, Muscato agreed to release the remainder of any claim against Carver as long as Carver did not file bankruptcy for 90 days.  After 90 days, the payment and transfer of property to Muscato could not be recovered in bankruptcy as a preference.  11 U.S.C. § 547.  See Record, at 111.  The settlement of the debt closed in September.  On September 10, 2007, Tammy disbursed the $85,000.00 from the New Account to the Muscato Family Limited Partnership #2.  Appendix, at 139.  Carver then waited until December 17, 2007, to file this Chapter 7 bankruptcy.

In connection with the bankruptcy, Carver filed the required Statement of Financial Affairs.  Appendix, at 15-23; see Bankruptcy Rule 1007(b), Official Form 7, Statement of Financial Affairs.  Carver answered the questions on the Statement of Financial Affairs under oath.  The first question asked Carver to state, among other things, his income from January 1, 2007, to the date that he filed bankruptcy.  Carver answered this

question, "0.00." <u>Appendix</u>, at 15.

The ninth question asked:

> List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

<u>Appendix</u>, at 19.  In response, Carver stated that on November 14, 2007, Carver paid $2,000.00 in fees and $299.00 in expenses to the Bourey Law Office.  <u>Id.</u>

The tenth question asked Carver to list all transfers of property out of the ordinary course of his business or financial affairs that occurred within one year prior to the filing of the bankruptcy.  In response, Carver listed a number of properties transferred to lenders in lieu of foreclosure.  Carver also listed the sale of the Autumn Ridge Home.  Carver stated:

> Sold real estate located at 6323 Autumn Ridge Court, Decatur, IL 62521 for $505,000.00.  Mortgage company was paid $248,752.38.  Debtor received approximately $100,000 from the proceeds of the sale and paid $85,000 to Muscato Family Limited Partnership, #2.

<u>Appendix</u>, at 20.  Carver did not disclose that he had transferred the Commission and his portion of the Sale Proceeds to Tammy and that she

paid the $85,000.00 to Muscato out of the New Account.

After the case was filed, Richardson asked Carver for another sworn statement regarding his income.  In response, Carver executed an Affidavit in which he stated: "I, Chaddrick R. Carver, state on oath that I have not received any income from any source from January 1, 2007 through November 30, 2007."  <u>Appendix</u>, at 102.

On March 14, 2008, Richardson commenced this adversary proceeding to object to Carver's discharge.  Richardson alleged that Carver received $110,000.00 from the Sale Proceeds and the Commission and transferred those funds to Tammy to hinder and delay creditors in violation of § 727(a)(2)(A).  <u>Record</u>, at 6-7.  Section 727(a)(2)(A) states:

> (a) The court shall grant the debtor a discharge, unless --
>       . . . .
>
>       (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed --
>
>>       (A) property of the debtor, within one year before the date of the filing of the petition; . . . .

11 U.S.C. § 727(a)(2)(A).

The Bankruptcy Court held the trial on the objection to Carver's

discharge on October 22, 2008.  Carver and Tammy testified.  Richardson and Carver had the following colloquy about the Commission:

> Q.   If you go to the second page at the top [of the settlement sheet] on line 701, you've got a realty fee of $30,300.

> A.   That's correct.

> Q.   Now the way the realty fee worked in this case, as I understand, Mr. Carver, is another realty company actually brought the buyer to the table, so the $30,000 was split between Markwell Weatherford and that other realty.

> A.   The other broker.  Yes.

> Q.   So each got a little over 15,000.

> A.   Yes.

> Q.   And as the listing agent on the sale of your own home, you would have gotten half of what Markwell Weatherford got, or a little more than $7,500.

> A.   Somewhere around there.  I'm sure I had dues, overdue dues, that came out of that, but you're probably right. Six, seven, somewhere around there.

> Q.   Okay.  (Pause) But you did earn the $7,500 commission.

> A.   It -- yeah, I guess so.

> Q.   All right.  How does that jive, Mr. Carver, with your schedules that say you had no income, your bankruptcy schedules in 2 -- for 2007, and what I'll call your affidavit that said you had no income in 2007?  That's just

inaccurate, isn't it?

A.    Yes, I believe so.

Q.    Okay.  So a component of how this got -- house got sold and where the money went was not disclosed to the Court. You got $7,500 and it shows nowhere, and it doesn't even show when I ask for a sworn statement.  Right?

A.    I guess.

Record, at 106-08.

Richardson and Carver also discussed why he transferred the Commission and his share of the Sale Proceeds to Tammy:

Q.    Did you transfer that money to Tammy as soon as you received it?

A.    I'm sure I signed it that day or the next day.  Sure.

Q.    All right.  Did Tammy give you anything in return for either of those two transfers?

A.    A roof over my head.

Q.    Explain to the Court what you're referring to.

A.    Well, I mean -- did she give me anything in return?

Q.    Yeah.

A.    Yes.  She -- she stayed with me, you know.  I screwed up. I was worried about losing her and the kids.  She didn't trust me with money.  I signed the check over to her and let her split it in half like she was supposed to.

Q.    By "split it in half," you mean on the house sale, she took her half of the money and put it in a pre-existing bank account in her name, and she took your half of the money with the Teachers' Credit Union and put it in another bank account in her name.

A.    That's correct.

Q.    And that's where it stayed until it was all spent.

A.    Spent on paying back creditors or attorneys.  Not going to Vegas.

Q.    The answer is, that's where it stayed until it was all spent.  Never got transferred back to you, no?

A.    No.  No.  I was not in control of it, no.

Q.    Same was true about the commission.

A.    Yes.

      . . . .

Q.    But you've got $110,000 in Tammy's name at the Credit Union.

A.    That's right.  We --

Q.    All right.

A.    -- we though [sic] we had to split it.  We had no idea it needed to be in whose name.

Q.    Well -- well, you didn't really split it.  You -- She took her half and she took your half.

11

A.    Right.  But she didn't trust my judgment.  She thought I would --

Q.    All right.

A.    -- you know --

Q.    All right.

A.    -- go out and do something wrong with the money.

Record, at 108-10.

At the end of that testimony, Richardson and Carver had the following

colloquy:

Q.    . . .  To my knowledge, . . . nowhere does [the Statement of Affairs] say, "Hey, a month and a half before I paid Muscato, I gave all this money to my wife."  Are you claiming anywhere in your sworn Statement of Affairs, petition, schedules anywhere, you disclose that to the Court?

A.    That I transferred money?

Q.    To Tammy.

A.    I didn't transfer.  I mean, you're trying to --

Q.    What -- what do you --

A.    -- make it look like I transferred to hide something.  That's not -- I mean --

Q.    I --

A.    -- I signed the check of closing over to her.  I didn't -- I mean --

Record, at 115-16.  Carver later testified why he signed the Sale Proceeds

and Commission over to Tammy:

> Because life blew up in her face and she had no idea what was going on with me and the business, and she did not trust me at all financially.  So she thought that if she oversaw the money that it would get disbursed the appropriate way.

Record, at 120.

Tammy also testified at the hearing.  She stated that she disbursed

$85,000.00 from the New Account to pay Muscato.  She stated that she

used the rest of the money to pay bills; she paid one-half of the household

bills from the Tammy Account and one-half from the New Account.  She

also paid Carver's personal bills and his attorney fees from the New

Account.  She stated that all of the money in the New Account was

disbursed by December 2007.  Record, at 126.

Tammy testified that she did not consider the money in the New

Account to be hers.  She said, "If I had, I wouldn't be pay [sic] Chad's bills

with it, which is what I did with all the money."  Record, at 127.

Richardson asked her why she paid Muscato $85,000.00 from the New

Account if she "didn't owe him any money?"  Id.  Tammy responded,

"Because it wasn't my money, it was Chad's money.  I was overseeing it because he had made bad financial decisions in the past and I wanted to make sure that bills were getting paid, . . . ."  Id.  Tammy also stated that, prior to the sale of the Autumn Ridge Home, she spent $13,000.00 of her own money to pay some of Carver's bills.  Id.

On examination by attorney Bourey, Tammy testified that she was the one who decided to put the funds in the New Account in her name:

> Q.    Was it your suggestion or Chad's suggestion for you to keep the money in an account in your name?
>
> A.    I -- it -- I mean, I guess mine.  I didn't really think about that either way.  I just wanted it in a separate account.  I didn't -- I didn't know it mattered if it was in his name or my name.  If I had known it mattered, it [sic] would have put it in his name, but I didn't realize that was a significant factor.  If I was trying to hide the money, I would have never paid his bills with it.

Id., at 130.

Two days after the trial, Richardson moved to amend his objection to add an additional objection that Carver's discharge should be denied because he made materially false statements under oath, in violation of Bankruptcy Code § 727(a)(4)(A).  Record, at 24.  Section 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless --

. . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case --

(A) made a false oath or account; . . . .

11U.S.C. § 727(a)(4)(A).  Richardson alleged that the trial established that Carver knowingly and fraudulently made six false statements under oath in connection with the bankruptcy:

a)    The failure of the debtor to disclose any income in 2007 prior to his bankruptcy as set forth in paragraph 1 of the debtor's statement of financial affairs;

b)    Providing to the Trustee a notarized statement in the course of his bankruptcy again attesting that the debtor had no income in 2007;

c)    The failure of the debtor to list the transfer of approximately $103,000.00 in real estate proceeds to his wife, Tammy Carver, in July of 2007;

d)    The failure of the debtor to list the transfer of a real estate commission in excess of $7,000.00 to his wife, Tammy Carver, in July of 2007;

e)    The debtor failed to identify payments and retention of his attorneys concerning debt consultation or bankruptcy beginning in May of 2007; and

f)    The failure of the debtor to list his wife, Tammy

Carver, as an unsecured creditor, although the debtor and his wife both testified that the debtor owed Tammy Carver money.

Record, 24-25.  The Bankruptcy Court allowed the Motion to Amend over Carver's objection.  Record, at 31.  Carver has not appealed that ruling. Richardson then filed an Amended Objection to Debtor's Discharge (Amended Objection).  Record, at 33-35.  Count I of the Amended Objection alleged the original § 727(a)(2)(A) objection for concealing assets, and Count II alleged the § 727(a)(4)(A) objection for making false statements under oath.

On February 20, 2009, the Bankruptcy Court issued its Opinion and Order (collectively Opinion).  Record, at 36-57.  The Bankruptcy Court found that the Trustee failed to prove that Carver transferred to Tammy his half of the Sale Proceeds and the Commission with the intent to defraud creditors, as required by § 727(a)(2).  The Bankruptcy Court found that Carver and Tammy were both credible, and both testified that Carver transferred the money to Tammy because Tammy did not trust Carver to make financial decisions, and because Carver wanted to save his marriage. Record, at 44.  The Bankruptcy Court also noted that Carver ultimately used the money to pay bills and bona fide creditors, such as Muscato.

16

Record, at 45.

The Bankruptcy Court also found that the Trustee failed to prove his § 727(a)(4) false oath claim.  The Court again found Carver's testimony credible that Carver did not disclose the transfer of the Sale Proceeds and the Commission to Tammy because he did not understand letting his wife handle these funds constituted a transfer.

The Bankruptcy Court found that the Trustee failed to prove that Carver earned the Commission.  The Bankruptcy Court stated: "The evidence was not clear whether the portion of the commission which the Debtor ultimately received was a refund or income."  Record, at 51.  The Bankruptcy Court criticized the Trustee for not presenting documents, such as 1099 forms or Carver's 2007 tax return, to prove that the payment was taxable income.

The Bankruptcy Court also found that the Trustee failed to prove that Carver, with fraudulent intent, had failed to report the Commission as income.  The Bankruptcy Court stated:

> Likewise, to prove a knowing and fraudulent intent in the non-disclosure, the Trustee must prove that the Debtor had knowledge that the commission was reportable income but, in the face of such knowledge, did not disclose the income. Virtually no evidence regarding the commission was presented.

> All the Court knows is that the Debtor received some portion of the commission paid to M-WRG from the sale of the Carvers' home. The evidence regarding the commission payment was not well developed and can only be described as sketchy at best. Based on such limited evidence, this Court cannot find that the Trustee has proven by a preponderance of the evidence that the Debtor knowingly and fraudulently made a false oath when he failed to report the real estate commission as income on his Statement of Financial Affairs.

Record, at 51-52.

The Bankruptcy Court found no fraudulent intent for Carver stating that he retained Bourey on November 14, 2007, to represent him in connection with the bankruptcy. The Trustee argued that Carver should have listed May 2007 as the date that he retained Bourey for this purpose. The Bankruptcy Court stated that beginning in May 2007, Bourey represented Carver on matters other than bankruptcy, such as preparing deeds in lieu of foreclosure and resolving the debt owed to Muscato. The Bankruptcy Court found, "There is no evidence that the Debtor decided to file or that his attorneys began work on the bankruptcy case prior to November 2007." Record, at 52.

Last, the Bankruptcy Court found that the Trustee failed to prove that Carver had fraudulently failed to disclose the debts he owed to Tammy. The Court found that the Trustee did not prove that Tammy's supposed

claim was a legally enforceable debt rather than a gratuitous transfer between spouses.  The Court also found that the Trustee failed to prove that Carver knew that he owed a legally enforceable debt to Tammy.  <u>Record</u>, at 53-54.

The Bankruptcy Court did not reach the issue of whether the alleged false statements were material because it found that the Trustee failed to prove that some of the statements were false and also failed to prove that Carver had made any of the statements with the requisite fraudulent intent. <u>Record</u>, at 54.

The Trustee then brought this appeal.

<u>ANALYSIS</u>

This Court reviews the Bankruptcy Court's factual determinations for clear error only.  <u>Bankruptcy Rule</u> 8013.  A factual finding is clearly erroneous if on reviewing the evidence, this Court is, "left with the definite and firm conviction that a mistake has been committed."  <u>Matter of Thirtyacre</u>, 36 F.3d 697, 700 (7th Cir. 1994).  The Court reviews the Bankruptcy Court's legal conclusions <u>de novo</u>.  <u>Matter of Sheridan</u>, 57 F.3d 627, 633 (7th Cir. 1995).  Decisions within the discretion of the Bankruptcy Court may only be reviewed for an abuse of discretion.  A decision is an

abuse of discretion only if no reasonable person could agree with the Bankruptcy Court.  See In re Morris, 223 F.3d 548, 554 (7th Cir. 2000). Based on these standards, the Court finds no reversible error in the Bankruptcy Court's decision regarding the Count I § 727(a)(2)(A) claim, but the Court finds the Bankruptcy Court clearly erred in its decision regarding the Count II § 727(a)(4)(A) claim.  The Trustee established that Carver recklessly misrepresented his income in 2007.  The Court will discuss each claim in order.

COUNT I § 727(a)(2)(A) OBJECTION

To establish a § 727(a)(2)(A) objection to discharge, the Trustee had to prove that Carver: (1) transferred his property, (2) with the intent to hinder, delay, or defraud a creditor, (3) within one year of his bankruptcy filing.  In re Kontrick, 295 F.3d 724, 736 (7th Cir. 2002).  The Bankruptcy Court found that the Trustee proved that Carver had transferred his share of the Sale Proceeds and the Commission within one year of filing, but did not prove that Carver had done so to hinder, delay, or defraud creditors. The Bankruptcy Court believed the testimony of Carver and Tammy that Carver let Tammy hold the money to save his marriage and to assure Tammy that the funds would be used to pay Carver's debts.  In addition,

20

the money was, in fact, used to pay creditors, primarily Muscato.  This Court sees no basis to disturb the Bankruptcy Court's credibility findings on these points.   Based on those findings, the Bankruptcy Court's conclusion was not clearly erroneous.

The Trustee complains that he proved the existence of recognized badges of fraud, and therefore, the burden shifted to Carver to show that he lacked fraudulent intent.  See Village of San Jose v. McWilliams, 284 F.3d 785, 792 (7th Cir. 2002).  The Trustee argues that the Bankruptcy Court did not shift the burden of proof to Carver.  The Court disagrees.  The Bankruptcy Court did not walk through a formal analysis of badges of fraud and shifting burdens of proof; however, the Bankruptcy Court evaluated Carver's evidence and found that Carver met the burden of showing that he did not have the intent to hinder, delay, or defraud creditors.  Carver did not understand that letting his wife Tammy control the bank account was a transfer; he always intended to use the money to pay creditors rather than defraud them; and he, in fact, used the money to pay creditors.  In light of the evidence presented, this Court cannot say that the Bankruptcy Court's finding on this issue was clearly erroneous.

COUNT II § 727(a)(4)(A) OBJECTION

To establish a § 727(a)(4)(A) objection to discharge, the Trustee had to prove: (1) Carver made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case.  In re Rothermel, 370 B.R. 185, 187 (Bankr.C.D.Ill. 2007).  To establish the intent to deceive, the Trustee had to prove that Carver acted knowingly or in reckless disregard for the truth. In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998); In re Baker, 205 B.R. 125, 132 (Bankr.N.D.Ill. 1997).  To establish materiality, the Trustee had to prove that the false statement bore, "a relationship to the bankrupt's business transactions or estate, or concern[ed] the discovery of assets, business dealings, or the existence and disposition of his property."  In re Baker, 205 B.R. at 133 (quoting In re Bailey, 147 B.R. 157, 162 (Bankr.N.D.Ill. 1992); accord In re Pratt, 411 F.3d 561, 566 (5th Cir. 2005); In re Keeney, 227 F.3d 679, 686 (6th Cir. 2000); Mertz v. Rott, 955 F.2d 596, 598 (8th Cir. 1992); In re Calder, 907 F.2d 953, 955 (10th Cir. 1990); In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984).  The Trustee was not required to prove that the false statement resulted in a specific

22

detriment or prejudice. In re Baker, 205 B.R. at 133.

In this case, the Bankruptcy Court clearly erred in finding that the Trustee failed to prove that Carver had falsely stated under oath that he earned no income in 2007 before he filed bankruptcy. The evidence is uncontroverted that Carver earned the Commission. Carver testified that: (1) he was the listing agent on the Autumn Ridge Home; (2) he earned the Commission of approximately $7,500.00; and (3) he received the commission check of approximately $6,000.00 to $7,000.00, after deductions for dues. The Bankruptcy Court found repeatedly that Carver was a credible witness. Carver testified that he was the listing agent on the Autumn Ridge Home and that he earned a Commission on July 26, 2007. The Bankruptcy Court mentioned the possibility that the check might have been a refund. There was no evidence of any refund. The Bankruptcy Court clearly erred; the Trustee proved that Carver falsely stated under oath that he earned no income in 2007.

The Bankruptcy Court also clearly erred in finding that the Trustee failed to prove that Carver had made this false statement knowingly and with the intent to deceive. The Trustee could meet this burden by showing that Carver made the statement in reckless disregard for the truth. In re

Chavin, 150 F.3d at 728.  The Trustee proved recklessness.  Carver was a licensed real estate broker with seven years experience.  He knew that a listing agent's commission on a real estate sale was income.  Further, the Trustee gave Carver a second chance to correct the false statement in the Statement of Financial Affairs.  The Trustee specifically asked for another sworn statement regarding Carver's income in 2007.  The Trustee focused Carver's attention to the question of his income in 2007.  The Trustee effectively notified Carver that he questioned the representation that Carver made no money in 2007.  Carver repeated the same false statement under oath a second time.  Under these circumstances, Carver's willingness to repeat his false statement under oath showed recklessness.  The Trustee met his burden on these issues.  The Bankruptcy Court's finding to the contrary was clearly erroneous.

The Bankruptcy Court's findings regarding the remainder of Carver's false statements were not clearly erroneous.  The evidence supported the finding that Carver did not understand that he transferred assets when he let Tammy control the disbursement of the Commission and his share of the Sale Proceeds.  The evidence also supported the finding that Caver did not believe that Tammy was a creditor with a legally enforceable claim.

24

Last, the Bankruptcy Court did not err in rejecting the Trustee's objection based on Carver's statement in the Statement of Financial Affairs that he first paid Bourey for bankruptcy representation on November 14, 2007. The Trustee argued that Carver retained Bourey in May 2007, to represent him in bankruptcy. See Record, 24-25 quoted above. The evidence indicates, though, that from May to November 2007, Bourey represented Carver on other matters. Bourey represented Carver in foreclosure proceedings; he prepared deeds in lieu of foreclosure, and he negotiated the settlement with Muscato. It is true that Tammy paid the $2,000.00 retainer to Bourey for Carver's bankruptcy in August 2007; however, the Trustee pressed this objection on the theory that bankruptcy representation began in May 2007. The evidence did not support the Trustee's position. Given the Trustee's theory, the Bankruptcy Court did not err in overruling the objection.

This Court, therefore, affirms the Bankruptcy Court's decision on Count II except for the findings regarding Carver's false statements about his income in 2007. Carver recklessly and repeatedly stated falsely that he earned no income in 2007. The Bankruptcy Court's findings to the contrary were clearly erroneous.

The Court, however, remands this matter to the Bankruptcy Court to determine whether Carver's false statements regarding his 2007 income were material.  The Bankruptcy Court did not reach the issue of materiality.  The Bankruptcy Court is in the best position to address this issue in the first instance.

THEREFORE, the Opinion of the Bankruptcy Court entered on February 20, 2009, is AFFIRMED as to Count I and AFFIRMED in part, REVERSED in part, and REMANDED as to Count II.  All pending motions are denied as moot.  This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   October 7, 2009

FOR THE COURT:

s/  Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE